IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DELPHI PETROLEUM, INC, | § | |
| | § | No. 47, 2017 |
| Plaintiff Below, Appellant and | § | |
| Cross-Appellee, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. N12C-02-302 |
| MAGELLAN TERMINAL | § | |
| HOLDINGS, L.P., | § | |
| | § | |
| Defendant Below, Appellee and | § | |
| Cross-Appellant. | § | |
| | § | |

Submitted: October 11, 2017
Decided: December 12, 2017

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR** Justices.

**ORDER**

This 12th day of December 2017, upon consideration of the parties' briefs, oral argument and the record of the case, it appears that:

1. This case involves contractual disputes between Delphi Petroleum, Inc. ("Delphi"), which buys and sells petroleum products, and Magellan Terminal Holdings, LP ("Magellan"), which operates petroleum storage facilities at the Port of Wilmington. The Superior Court ruled on the various disputes after hearing pre-trial motions and conducting a bench trial. Delphi, the plaintiff/appellant, states

1

twelve claims on appeal. Magellan states two claims on cross-appeal. For the reasons which follow, we find that one of Delphi's claims has merit. In that claim Delphi contends that the trial judge erred in its choice of the date from which pre-judgment interest should begin to run on certain money which Magellan owed Delphi. We also find that one of Magellan's claims has merit. In that claim, Magellan contends that the trial court erred in finding that Magellan committed fraud. On those two issues, we reverse the Superior Court. On all other issues, we affirm the Superior Court for the reasons assigned by it in its Opinion and Order dated June 23, 2015 and its Decision After Trial dated June 27, 2016. Accordingly, we need discuss only the two issues we find to have merit.

2. As mentioned, Delphi buys and sells petroleum products. Magellan operates a marine terminal in Wilmington, Delaware where petroleum products can be stored. Delphi and Magellan entered into two "Terminalling Agreements," one on September 1, 2005 and one in May 2011. The Terminalling Agreements set forth the terms and conditions under which Delphi would store its petroleum products at Magellan's terminal.

3. One of the terms of the agreements was that Magellan would heat tanks containing heavy oil and Delphi would reimburse Magellan for the cost of the fuel consumed in heating those tanks plus 18%. The 2005 agreement provided that

2

gauges would be used to measure the quantity of fuel used to heat tanks. Between 2005 and 2010, however, Magellan used meters to measure the amount of fuel used. One of Delphi's claims was that the use of meters, rather than gauges, resulted in Magellan overcharging for fuel. On the eve of trial, Magellan voluntarily refunded $421,603 for tank heating charges for the years 2007-2010. The explanation for the refund given by Magellan was that it could not satisfy itself as to whether the meters were recording more oil usage than actually occurred.

4. At trial Delphi continued to press its claim for tank heating overcharges, claiming that Magellan also overcharged it in 2005 and 2006. In its Decision After Trial, the trial judge ruled that Delphi had been overcharged for tank heating in the amount of $114,547 in 2005 and 2006 ($27,396 for 2005 and $87,151 for 2006). He also ruled that Magellan overcharged for tank heating in the amount of $421,603 from 2007 to 2010 (the amount refunded by Magellan just prior to trial). In addition to awarding Delphi the $114,547 in overcharges for 2005 and 2006, the trial judge awarded Delphi interest at the statutory rate on the entire overcharge of $536,150 ($114,547 + $421,603) from September 25, 2013.

5. The date of September 25, 2013 was selected as the date from which interest should run because on that date Delphi made a substantial payment of $1,085,466.42. Delphi contends that the date of September 25, 2013 bears no

3

relevance to the heating overcharges. It contends that the relevant dates from which interest should be calculated are the dates upon which Delphi paid the invoices containing overcharges from 2005 to 2010. Magellan contends that prior to September 25, 2013 Delphi's account was in a net negative condition and awarding Delphi interest for a period of time when it owed Magellan roughly twice the amount of the heating overcharges would give Delphi an unwarranted windfall.

6. We review the determination of when pre-judgment interest begins to run *de novo*.[1] Pre-judgment interest is awarded as a matter of right in a Delaware action based on breach of contract or debt.[2] The purpose is two-fold: "first, it compensates the plaintiff for the loss of the use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim."[3] Generally, pre-judgment interest accumulates from the date payment was due to a party[4], or alternatively "when the plaintiff first suffered a loss at the hands of the defendant."[5]

---

[1] *Lamourine v. Mazda Motor of Am., Inc.*, 2009 WL 2707387, at *3 (Del. Aug. 28, 2009).
[2] *Delta Eta Corp. v. Univ. of Delaware*, 2010 WL 2949632, at *2 (Del. July 29, 2010).
[3] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011).
[4] *Moskowitz v. Wilmington*, 391 A.2d 209, 210 (Del. 1978).
[5] *TranSched Sys. Ltd. v. Versyss Transit Sols., LLC*, 2012 WL 1415466, at *5 (Del. Super. Mar. 29, 2012).

7. The record of the manner in which Magellan applied the $1,085,466.42 payment made on September 25, 2013 appears to show that it was applied to invoices having due dates from September 5, 2010 to November 27, 2013.[6] It does not appear to have been applied to an invoice with a due date prior to September 5, 2010. We agree with Delphi that interest on the overcharges for fuel for heating tanks runs from the date Delphi paid such overcharges, not from September 25, 2013. We remand the case to the Superior Court for any further proceedings necessary to determine the dates from which interest runs or the amount of such interest.[7]

8. The other claim we find to have merit is Magellan's claim that the trial court erred in finding that it committed fraud. The facts relevant to this claim occurred during the negotiation of the 2011 Terminalling Agreement.

---

[6] Appellant's Appendix A1218.

[7] Delphi sought interest at the rate of 1.5% per month. The trial judge awarded interest at the statutory interest rate. We find no error in the trial judge's decision to award interest at the statutory rate. But in the course of reviewing its interest calculation, we recommend that the Superior Court revisit its accompanying decision to require Magellan to refund, in proportion to the heating overcharges, a portion of the interest it collected on invoices Delphi failed to timely pay between 2010 and 2013. *See* Opening Br. Ex. A, at 54–56 & n.208 (directing Magellan to refund Delphi 29.5% of the interest it charged on Delphi's overdue balance by calculating that 29.5% of the balance consisted of overbillings, of which the $536,150 in heating overcharges was the predominant part). It does not appear, from the record before us, that much—if any—of the interest that Magellan charged over that three-year period was derived from any of the heating overcharges because the heating overcharges occurred between 2005 and December 2010, while the invoices that Magellan assessed with interest were billed between September 2010 and September 2013. While it may have been proper to require Magellan to refund interest derived from overcharges present on *those* invoices, it does not appear that the heating overcharges were among them (perhaps with the small exception of any heating overcharges that were not timely paid between September 2010 and December 2010).

9. During those negotiations Delphi's counsel, Ron Gumbaz, wrote an email to Magellan's Tony Bogle, Aaron Milford, Robb Barnes, and Ronnett Beall stating:

> Please see revised draft. Delphi had the right to, and did, deliver to the terminal by truck in the original agreement and needs that in this agreement.[8]

Clause 2.1(a) of Schedule A of the previous draft read, in pertinent part:

> Deliveries of product from the terminal via truck will be made to a Carrier in accordance with the Terminal's operating procedures and in accordance with this Schedule A Section 2.4 . . .

The revised draft attached to Gumbaz's email proposed to add at the beginning the phrase "Receipts and," with the clause then reading:

> Receipts and deliveries of product from the terminal via truck will be made to a carrier in accordance with the Terminal's operating procedures and in accordance with this Schedule A Section 2.4 . . .

Delphi had previously attempted to have the phrase "Receipts and" included in the agreement, but Magellan had not agreed. This time, however, Beall responded with an email stating, "I have spoken with [Bogle] and [Barnes]. We are in agreement with your two changes dealing with improvement costs and truck receipt language."[9] Magellan included the revised truck delivery language in the 2011 agreement.

---

[8] A1222.
[9] A1250.

10.    Beall testified that she sent the email accepting the revised truck delivery language at the direction of Bogle and Barnes.    The trial court found that at the time Beall sent the email to Delphi, Bogle knew that Magellan would not allow Delphi to deliver petroleum products to the terminal by truck.    Barnes testified that Magellan understood that by proposing the amended language, Delphi was requesting the right to deliver such products to the terminal by truck.    Gumbaz testified that Delphi would not have executed the 2011 agreement if Magellan had not agreed to allow Delphi to deliver petroleum products to the terminal by truck.

11.    In January 2012, Delphi notified Magellan of its intent to deliver petroleum products to the terminal by truck.    Magellan's response was that in order for delivery by truck to occur, modifications would need to be made to the terminal. It proposed two options, one costing $25,000 and one costing $2,500, payment of which, it proposed, would be the responsibility of Delphi.    It also proposed an amendment to the agreement under which Delphi would pay a $160 fee for each delivery by truck.    Delphi rejected Magellan's proposals and did not deliver petroleum products to the terminal by truck.

12.    Delphi and Magellan both first raised the truck delivery issue before trial in cross-motions for partial summary judgment.    Delphi contended that Magellan breached the truck delivery provision.    Magellan contended that it did not breach

7

the provision. Magellan argued that the truck delivery provision was unambiguous and permitted Delphi to load petroleum products from the terminal onto trucks, but did not permit Delphi to deliver oil to the terminal in trucks. It argued that clause 2.1(a) referred to receipts and deliveries *from* the terminal and did not refer to receipts and deliveries to the terminal. It also argued that other provisions of the agreement supported this conclusion. After analyzing the agreement, the trial judge agreed with Magellan that the agreement was unambiguous and did not permit Delphi to deliver petroleum products to the terminal by truck. Delphi has not appealed that ruling. Delphi also asserted a separate fraud claim against Magellan in connection with the truck delivery issue. The trial court was satisfied that Delphi's allegations of fraud were sufficient to allow that claim to proceed to trial.

13. At trial Delphi argued that Beall's email fraudulently induced it to enter into the 2011 agreement, and that Magellan so induced Delphi knowing that the contractual right to deliver product to the terminal by truck was a material requirement for Delphi in negotiating the 2011 agreement. It argued that Magellan deliberately concealed facts important to the transaction and that Magellan had a duty to disclose that it would not accept petroleum products delivered by truck in order to prevent Delphi from entering into the agreement. Delphi claimed large damages resulting from such fraud.

14.     The trial court found that Beall's email, that "[w]e are in agreement with your [change] dealing with    . . . truck receipt language," was a false representation. It also found that Delphi had established all of the other elements of fraud and that it had fraudulently induced Delphi to enter into the agreement.    However, the trial court awarded Delphi only $2,500 on this claim on the ground that Delphi could have mitigated its damages by paying for the $2,500 modification to equip the terminal to accept petroleum products delivered by truck.

15.     When a Superior Court Judge sits as the finder of fact, we review his decisions as a mixed question of law and fact.[10]    We have the authority to review the record below, examine the sufficiency of the evidence and test the propriety of the findings.[11]    However, we do not ignore the findings made by the trial judge.[12] We affirm his findings so long as they are sufficiently supported by the record and are the result of orderly and logical reasoning.[13]

16.     It is well settled in Delaware that common law fraud requires the showing of "a false representation, usually one of fact, made by the defendant."[14] We do not believe that Beall's email contained a false representation.    It simply

---

[10]  *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).
[11]  *Id.*
[12]  *Id.*
[13]  *Id.*
[14]  *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

indicated Magellan's agreement to Delphi's proposed change to the truck delivery clause.

17. The true gist of Delphi's complaint is that when Magellan agreed to Delphi's language, it knew that the terminal was not equipped to handle delivery of petroleum products to the terminal by truck and that Delphi's language did not accomplish its material goal of being able to do so, and that it failed to disclose those facts. However, in an arms' length transaction, a party has no affirmative duty to speak, unless circumstances create such a duty.[15] In the absence of such a duty, "one party to a business transaction is not liable to the other for harm caused by his failure to disclose to the other facts of which he knows the other is ignorant and which he further knows the other, if he knew them, would regard as material in determining his course of action in the transaction in question."[16] A duty to speak is created by special circumstances in the relationship between the parties, such as a relationship of trust or confidence.[17] We do not believe that Beall's email or any special circumstances created a duty on the part of Magellan to speak beyond its agreement to Delphi's truck delivery term.[18] Moreover, the contract in this case

---

[15] *Prairie Capital III, L.P. v. Double E. Holding Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015).
[16] Restatement (Second) of Torts § 551, Comment *a*.
[17] *Prairie Capital III, L.P.*, 132 A.3d at 52.
[18] Restatement (Second) of Torts § 551(2).

was determined by the trial judge to be unambiguous in not permitting Delphi to delivery petroleum products to the terminal by truck. Magellan did not have an obligation to correct Delphi's misunderstanding of an unambiguous contract. We, therefore, conclude that it was error for the trial court to find that Magellan committed fraud in connection with truck deliveries.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court is AFFIRMED in part, REVERSED in part, and REMANDED for any necessary further proceedings consistent with this order.

BY THE COURT:

/s/ James T. Vaughn, Jr.
Justice

11